UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JOE SEALS A/K/A JAMES JAMESON,

                                Petitioner,                 **MEMORANDUM AND ORDER**

                 -against-                                                   12-CV-1097 (SLT)

P. HEATH,

                                Respondent.
-----------------------------------------------------------------x
**TOWNES, United States District Judge:**[1]

*Pro se* petitioner, Joe Seals, seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2008 conviction in the Supreme Court of the State of New York, Kings County, on charges of manslaughter in the second degree and criminal possession of a weapon in the second degree. Petitioner argues that the State lacked sufficient evidence to disprove his justification defense beyond a reasonable doubt, that the verdict was against the weight of the evidence, and that the sentence imposed by the trial court was excessive. For the reasons stated below, the Court finds that the evidence was sufficient to disprove petitioner's justification defense beyond a reasonable doubt and that the weight of evidence and excessive sentence arguments raised on appeal are not cognizable upon habeas corpus review. Accordingly, the petition is denied.

## *BACKGROUND*

Just before noon on May 5, 2007, Robert Ellis was shot and killed inside a social club located at 415 Classon Avenue in Brooklyn, New York. Police responded to the scene within minutes of the shooting and interviewed witnesses who implicated the petitioner. Petitioner was

---

[1] The Court gratefully acknowledges the assistance of an intern, Daniel P. Jones of St. John's University School of Law, in the preparation of this Memorandum and Order.

1

arrested around 2:55 p.m., and was transported to the 79th Precinct, where he was interviewed by Detective Christopher Hennigan, the detective assigned to the case.

After being advised of his *Miranda* rights, petitioner gave a statement in which he admitted to shooting Ellis, but claimed to have acted in self-defense. Trial Transcript ("Tr.") at 81-82. Petitioner was subsequently indicted on charges of murder in the second degree and criminal possession of a weapon in the second degree. He elected to waive his right to a jury trial and, in October 2008, went to trial before Justice Neil Firetog.

***The People's Case***

On their direct case, the People adduced testimony from two eyewitnesses to at least part of the incident: Toni Roseboro and Rochelle Hampton. Both eyewitnesses knew and were friends with petitioner and Ellis for many years. Roseboro testified that she was friends with petitioner for nine years and with Ellis for fifteen years. *See* Tr. at 14. Hampton testified that she had been friends with petitioner for twenty-five years and knew Ellis well as he was her "cousin's cousin." *Id.* at 142-43.

Both Roseboro and Hampton described the layout of the club, which sat on the corner of Lexington and Classon Avenues in Brooklyn. Both witnesses agreed that the club had a total of three doors: one on Lexington Avenue, one on Classon Avenue, and one leading to the backyard. *Id.* at 19-21; 35-36; 156. According to Roseboro, the door leading to Classon Avenue was at one end of the club and the other doors were at the other end. *Id.* at 19-20. Roseboro recalled that all three doors were open on May 5, 2007, while Hampton stated that at least two of the three doors were open that day. *Id.* at 37, 156.

Roseboro testified that approximately seven people, including Ellis, were already in the club when she arrived at around 9:00 a.m. *Id.* at 16-17. Ellis was "like the doorman" of the

2

club, the person who decided who could and could not enter. *Id.* at 44-45. Although Roseboro knew that Ellis had "a cane with a sword inside it," and was rumored to have committed various violent acts, she herself had never witnessed Ellis using the cane or hitting anyone. *Id.* at 38, 45.

Around 10 or 10:30 that morning, petitioner entered the club. *Id.* at 17. Petitioner and Roseboro conversed for about half an hour at one end of the bar while Ellis sat in a corner at the other end, close to the door leading to Classon Avenue. *Id.* at 18-22. At some point during that half-hour, petitioner and Ellis began speaking to each other. *Id.* at 23-24. Roseboro did not hear the entirety of their conversation because she left the premises briefly to retrieve a ladder from the backyard. *Id.* at 24.

By the time Roseboro returned, the conversation was "getting a little bit louder." *Id.* at 24. While Roseboro characterized the conversation as "a little bit hot, then . . . a little bit low," she testified that it was "nothing like" what one might characterize as a "fight." *Id.* at 23-24. The men remained seated, with Ellis still at the bar near the Classon Avenue exit and petitioner at a table along the Lexington Avenue side of the building. *Id.* at 23, 25. The club's owner told the men to "calm down," then asked Roseboro to "go to the store for her." *Id.* at 25.

Upon her return from the store, Roseboro stood outside the club for a while, conversing with two other people. *Id.* at 26. As she did so, Roseboro heard "about two" "popping" noises and the sound of Hampton screaming for Ellis to "get up." *Id.* at 26-27. Although the noises "didn't sound like a gunshot," Roseboro initially moved behind a brick wall in the backyard because she "didn't know what it was." *Id.* at 26. By the time she re-entered the club through the backyard door, Ellis was lying face-down, bleeding, and petitioner was nowhere to be seen. *Id.* at 28.

3

Although Hampton was inside the club during the shooting, she was preoccupied with "refreshing [her] toenail polish" and "wasn't paying that much attention" until just before the shooting. *Id.* at 145. Hampton testified that she arrived at the club around 11:00 a.m. *Id.* at 143-44. Ellis, who Hampton described as the club's "doorman," was "[s]itting at the end of the bar . . . talking shit the way he usually [did]" to a man named Charles and a woman named Mona, who were seated near him at the bar. *Id.* at 146. Hampton was aware that petitioner had been involved in a relationship with Mona, and described the two of them as "boyfriend and girlfriend." *Id.* at 146-47.

At some point, petitioner entered the club. Although Hampton was there at the time, she could not recall when he arrived or if he arrived alone. *Id.* at 145. Indeed, Hampton—who was seated facing Lexington Avenue, with her back to the bar and her foot up on a chair—did not even notice that petitioner was there until she heard "two capping noises" and heard Ellis say, "go ahead, M-Fer," or "something like that." *Id.* at 147-48, 167. Although Ellis's voice was "kind of loud," Hampton had not heard "anything noticeable that would sound like an argument or anything like that" up until that point. *Id.* at 150.

Hampton had been sitting about 10 to 12 feet away from where Ellis had been sitting at the bar. *Id.* at 170. From the sound of Ellis's voice, Hampton inferred that Ellis was standing up. *Id.* at 150. According to Hampton, Ellis was a "big," "stupid," "bully," and a "violent man" who Hampton had seen assault other people. *Id.* at 150, 157-59. Believing she had to "watch her back," Hampton turned around. *Id.* at 150. However, Hampton did not immediately turn toward Classon Avenue, but toward the other end of the bar. *Id.* at 166.

As she turned toward that end of the bar, Hampton saw petitioner raise his arm and hand toward Classon Avenue—the side of the bar where Ellis had been seated. *Id.* at 149, 166. She

4

then heard "about two" sounds, which she described as "cap, cap, cap." *Id.* at 149-50. Hampton did not see anything in petitioner's hand, and did not immediately recognize the sounds as gunshots. *Id.* at 149-151. Only after she turned all the way around and saw Ellis lying face down on the ground, bleeding from the head, did Hampton infer that Ellis had been shot. *Id.* at 151.

According to Hampton, Ellis fell parallel to the bar with his feet closest to Classon Avenue. *Id.* at 151. Although Ellis had moved closer to petitioner before he was shot, petitioner "more or less remained where he had been." *Id.* at 163. Ellis was still approximately five to seven feet away from petitioner when he fell. *Id.* at 171. Petitioner then walked out of the club through the Lexington Avenue exit. *Id.* at 152.

Both Hampton and Roseboro testified that they helped turn Ellis over. *Id.* at 28-29; 152-53. Hampton then performed CPR and attempted to stop the bleeding. *Id.* Neither witness saw a weapon on or near Ellis's person. *Id.* at 30, 154.

Detective Hennigan testified about the statement which petitioner gave him at the 79th Precinct on the afternoon of May 5, 2007. According to Hennigan, petitioner said that he went to the social club that morning to meet up with his girlfriend and to have a drink. *Id.* at 81. There, he encountered Ellis who, according to petitioner, had a history of "messing with him." *Id.*

As soon as petitioner entered the social club, Ellis "started in with him." *Id.* The confrontation remained verbal until petitioner flashed a pistol that he had concealed in his waistband. *Id.* Ellis kept taunting petitioner then made a move towards him, still taunting him. *Id.* at 81-82. Petitioner fired one shot towards the floor, but Ellis kept coming. *Id.* at 82. He then fired two more shots at the floor but Ellis continued towards him. *Id.* at 82. Finally,

5

believing that Ellis "was about to choke him" petitioner shot Ellis in the head. *Id.* at 82. Petitioner told Hennigan that he did not intend to hurt Ellis, but acted because "he was afraid for his life." *Id.*

Less than two hours after petitioner made his statement to Detective Hennigan, Kings County Assistant District Attorney John Giannotti arrived at the 79th Precinct to take a videotaped statement. *Id.* at 83. A DVD of that statement was introduced through Detective Hennigan, who was present throughout petitioner's statement, as People's Exhibit 4. On that DVD, petitioner largely repeated the account which he had given Hennigan. However, he also admitted that he was sitting closer to the door than Ellis. *See* People's Exhibit 4. When asked why he did not retreat through any of the three open doors, petitioner stated he did not want to look like a "coward" in front of his girlfriend. *Id.* Further, petitioner stated that he should not have to run because he was not in "the mood to run." *Id.*

The People also called Dr. Frede Frederic to testify regarding the autopsy she performed in her role as a City Medical Examiner. Tr. at 104. Dr. Frederic testified, *inter alia*, that there was no soot around the surface area of the wound. *Id.* at 107. Dr. Frederic opined that this meant that the muzzle of the gun was at least 15 inches away from Ellis when the shot which created the wound was fired. *Id.* at 107-108.

*The Defense's Case*

The defense called three character witnesses. The first, Shirley Ann Brown, testified that she had known petitioner and Ellis for over ten years. *Id.* at 118. She stated that petitioner was "mild-mannered" and a "good guy," while Ellis, in contrast, had a reputation of being a bully. *Id.* at 118-20. Brown recounted stories she had heard about a time Ellis abused a woman named "Doll Face" by grabbing her by her neck or throat. *Id.*

The second character witness, Katherine Williams, testified that she had known petitioner for forty-five years and Ellis for about thirty years. *Id.* at 131. Williams, like Brown, testified that Ellis had a reputation for being a bully and a violent person. *Id.* at 132. Williams also recalled the "Doll Face" incident and stated that she had heard that Ellis "grabbed her, and he had her up in the air, choking her." *Id.* at 136. Williams testified that petitioner was a "peaceable person" and she had never "known him to be violent." *Id.* at 135.

The third character witness was James Lovejoy, petitioner's friend of forty-one years. *Id.* at 184-85. Lovejoy admitted he had a prior criminal record, including convictions for robbery, grand larceny and kidnapping, but claimed to have been a law-abiding citizen since 1993. *Id.* at 185-86. Lovejoy testified that he had heard Ellis tell petitioner that he was going to kill him two years prior to the incident on May 5, 2007. *Id.* at 187-90. Lovejoy, like the two preceding witnesses, testified that Ellis had a reputation for being a violent person. *Id.* at 188.

The defense also called Dr. Cheryl Paradis, a psychologist at Kings County Hospital, to testify about petitioner's physical and mental state at the time of the incident. *Id.* at 195. Dr. Paradis had examined petitioner four times immediately after the incident in 2007. *Id.* She testified that petitioner had suffered a serious head injury twenty years prior to the incident. *Id.* at 197, 209-10. This injury caused partial blindness and required petitioner to be on medication that affected his mental capacity. *Id.* at 197, 209-10. Dr. Paradis opined that this physical injury left petitioner feeling especially vulnerable to an attack. *Id.* at 209.

***The Trial & Verdict***

Following summations, Justice Firetog acquitted petitioner of murder in the second degree and manslaughter in the first degree. *Id.* at 252. However, Justice Firetog found petitioner guilty of manslaughter in the second degree, implicitly rejecting petitioner's

7

justification defense, and convicted petitioner of criminal possession of a weapon in the second degree. *Id.* At sentencing on November 13, 2008, Judge Firetog adjudicated petitioner a second felony offender and sentenced him to an indeterminate term of 5 to 10 years for the manslaughter conviction and to a determinate term of ten years, plus five years of post-release supervision, for the weapon offense. Although those sentences were to run concurrently, they were consecutive to a sentence which petitioner was already serving on another, unrelated offense.

*Appellate History*

Petitioner appealed his conviction on three grounds. First, citing to the Fourteenth Amendment, petitioner argued that there was insufficient evidence to disprove his justification defense beyond a reasonable doubt. Second, petitioner argued in the alternative that his conviction was against the weight of evidence. Third, petitioner argued, without evoking federal law or the Constitution, that his sentence was excessive given his age, health condition and non-violent history.

In 2010, the Appellate Division of the Supreme Court of the State of New York, Second Department, unanimously affirmed petitioner's conviction. *People v. Seals*, 909 N.Y.S.2d 653 (N.Y. App. Div. 2d Dept. 2010). The Appellate Division held that (1) the evidence, viewed in the light most favorable to the prosecution, was "legally sufficient to disprove the . . . justification defense beyond a reasonable doubt"; (2) the verdict was not against the weight of the evidence; and the sentence was not excessive. *Id.* In 2011, the New York Court of Appeals denied petitioner's application for leave to appeal. *People v. Seals*, 946 N.Y.S.2d 201 (N.Y. 2011). Petitioner did not seek a writ of certiorari in the United States Supreme Court.

On March 1, 2012, petitioner commenced this action, seeking a writ of habeas corpus under 28 U.S.C. § 2254. In this action, petitioner raises the same three claims which he raised

upon direct appeal: (1) that the State lacked sufficient evidence to disprove his justification defense beyond a reasonable doubt, (2) that the verdict was against the weight of the evidence and (3) that the sentence imposed was excessive. For the reasons set forth below, this Court concludes that petitioner's arguments are without merit.

## DISCUSSION

### Standard of Habeas Review

Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." A state court decision is contrary to clearly established federal law if the state court applies a rule that contradicts governing Supreme Court precedent or the state court confronts a set of facts that is materially indistinguishable from a Supreme Court decision and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision is an "unreasonable application" of federal law if the state court's application of governing Supreme Court precedent is objectively unreasonable. *Id.* at 409, 413; *see also Mask v. McGinnis*, 252 F.3d 85, 88-89 (2d Cir. 2001).

An erroneous application of federal law is not necessarily an unreasonable one. *Williams*, 529 U.S. at 410-11. Nevertheless, as interpreted by the Second Circuit, "although 'some increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest

judicial incompetence.'" *Mask*, 252 F.3d at 89 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). On habeas review, state court factual determinations are presumed correct, and the petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

*Sufficiency of Evidence*

The Supreme Court of the United States has held that "the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). However, a petitioner challenging a conviction based on the sufficiency of evidence has a very "heavy burden." *United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006). "Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). To prevail upon a sufficiency of evidence claim, petitioner must prove that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324. Thus, the relevant question in adjudicating a petitioner's sufficiency argument is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

"This standard applies with equal force to the sufficiency of proof as to a defense, such as justification under N.Y. Penal Law." *Ledesma v. Cunningham*, No. 03 Civ. 6322, 2004 WL 1775677, at *11 (S.D.N.Y. Aug. 10, 2004). Accordingly, in this case, in which petitioner argues that the People failed to disprove his justification defense beyond a reasonable doubt, the

relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational finder of fact could have found that petitioner's justification defense was disproved beyond a reasonable doubt.

The justification defense applicable to this case is set forth in N.Y. Penal Law § 35.15. Subdivision 1 of § 35.15 provides that:

> A person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself ... from what he ... reasonably believes to be the use or imminent use of unlawful physical force by such other person unless:
>
> (a) The latter's conduct was provoked by the actor with intent to cause physical injury to another person; or
>
> (b) The actor was the initial aggressor; except that in such case the use of physical force is nevertheless justifiable if the actor has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened imminent use of unlawful physical force ...

Subdivision 2 provides, in relevant part, that:

> A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:
>
> (a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of doing so by retreating ...

"[W]henever justification is sufficiently interposed by the defendant, the People must prove its absence to the same degree as any element of the crime charged." *People v. McManus*, 67 N.Y.2d 541, 546-47 (1986).

This justification statute "imposes a two-part test which involves both subjective and objective components." *Matter of Y.K.*, 87 N.Y.2d 430, 433 (1996). Under the subjective component, the fact-finder must determine if the defendant subjectively believed that deadly

force was necessary to defend against the imminent use of deadly force. *Id.* Under the objective component, the fact-finder must determine if defendant's belief was objectively "reasonable under the circumstances." *Id.* at 433-34. The reasonableness determination takes into account the defendant's "circumstances" and "situation," including the defendant's knowledge of the actor, physical characteristics of both the actor and victim, and any relevant prior experiences the actor had. *People v. Goetz*, 68 N.Y.2d 96, 114-115 (1986).

In cases involving the use of deadly force, the People may disprove the justification defense by establishing that the defendant's subjective belief that he was in mortal danger was objectively unreasonable. *See Lopez v. Ercole*, No. 09 Civ. 1398 (PAC) (AJP), 2010 WL 1628994, at *25 & n. 50 (S.D.N.Y. Apr. 21, 2010) (citing cases). Petitioner "cannot be responding to the past use of deadly force, but only to its present or imminent use." *People v. Roldan*, 222 A.D.2d 132, 138 (N.Y. App. Div. 1st Dept. 1996). The People can also disprove justification "by proving that the defendant was the aggressor and that he did not withdraw from the altercation." *Serrata v. Fischer*, No. 13 Civ. 2632 (LGS), 2013 WL 5708599, at *11 (S.D.N.Y. Oct. 21, 2013). "If a defendant confronted with deadly physical force knows retreat can be made with complete safety and fails to do so, the defense [of justification] is lost." *Matter of Y.K.*, 87 N.Y.S.2d at 434.

In this case, a rational finder of fact could conclude that the People proved beyond a reasonable doubt that petitioner was not objectively reasonable in believing that Ellis was about to use deadly force. There is ample evidence that the victim was unarmed throughout the incident. Both Roseboro and Hampton, the only two testifying witnesses who were on the scene, stated that there was no weapon either on the victim's person or in the general area of his body.

*See* Tr. at 30, 154. Also, the first police officer on the scene, Officer Struggs, testified that he did not see any weapons on the victim. *Id.* at 53.

While petitioner told Detective Hennigan that he thought Ellis would have choked him or taken the gun from him, there no was evidence to substantiate petitioner's speculation. To the contrary, Hampton testified that Ellis was still five to seven feet—well more than an arm's length—from petitioner when Ellis fell to the ground. Furthermore, petitioner did not shoot Ellis in the legs in an effort to incapacitate him, but shot him once in the head, killing him. Given these facts, a reasonable finder of fact could find beyond a reasonable doubt that petitioner's use of deadly force was not objectively reasonable.

Even assuming, *arguendo*, that petitioner could prove he "reasonably believed" deadly force was necessary, a rational finder of fact could find that the People proved, beyond a reasonable doubt, that petitioner himself provoked Ellis and was the initial aggressor. While Ellis may have initiated the verbal argument, petitioner himself admitted introducing the threat of deadly force by flashing the gun while the victim was still sitting at the bar. *See* Tr. at 81. Although Ellis was unarmed, petitioner then fired the supposed "warning shots" that escalated the confrontation into a violent one. *See* Tr. at 150. Therefore, even if petitioner's use of deadly force had been objectively "reasonable," a rational finder of fact could have concluded that the defense of justification was unavailable because petitioner was the initial aggressor and provoked Ellis into approaching him.

Furthermore, even had petitioner not been the initial aggressor, a rational finder of fact could find that the People proved beyond a reasonable doubt that he could have retreated in complete safety. Petitioner admitted that he was sitting closer to the door than Ellis was. *See* People's Exhibit 4. Although Ellis may have stood between petitioner and the Classon Avenue

13

exit, petitioner had an unimpeded path to the Lexington Avenue exit. That door was clearly unlocked, since petitioner used it to exit the club immediately after the shooting. At all times leading up to the fatal shot, petitioner could have retreated through that door but chose not to do so.

Although the defense asserted at trial that the victim would have chased him down and used the gun against him if he attempted to retreat, petitioner gave entirely different reasons for his failure to retreat in the hours immediately following the incident. *See* People's Exhibit 4. Petitioner himself admitted that he did not retreat because he did not want to look like a "coward" in front of his girlfriend. *Id.* Second, petitioner stated that he was not in the "mood to run." *Id.* Accordingly, a rational trier of fact had ample reasons to discount the defense's claim that petitioner could not retreat in complete safety.

In sum, petitioner has not met his heavy burden of establishing that the evidence was insufficient to disprove his justification defense. A rational finder of fact could find beyond a reasonable doubt that petitioner was not objectively reasonable in his use of deadly force. The finder of fact could also find beyond a reasonable doubt that petitioner was not entitled to the justification defense because he was the initial aggressor, who deliberately provoked Ellis into approaching him, and that petitioner could have retreated in complete safety through the Lexington Avenue exit.

### *Weight of the Evidence*

Petitioner also argues that the trial court's verdict was against the weight of the evidence. However, the petitioner's weight of the evidence argument is not cognizable upon habeas corpus review. Unlike petitioner's sufficiency of the evidence claim, which is based on the due process clause of the Fourteenth Amendment, a weight of the evidence claim is a "pure state law claim

14

grounded in New York Criminal Procedure Law § 470.15(5)." *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001). Thus, this Court cannot consider this claim under § 2254(a), which permits this Court to "entertain an application for a writ of habeas corpus . . . only on the ground that [the applicant] is in custody in violation of the Constitution or laws or treaties of the United States."

*Sentence Imposed Was Excessive*

Finally, petitioner argues that the 10-year sentence imposed was excessive given his age, health condition and non-violent history. As noted above, a claim is cognizable on federal habeas review only if it raises an issue of federal or constitutional law. *See, e.g., Lewis v. Jeffers*, 497 U.S. 764, 780-81 (1990). "No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992) (per curiam).

In this case, the sentences imposed by Justice Firetog were within the range prescribed by New York State law. At sentencing, petitioner admitted that he had been previously convicted of a Class B non-violent felony and was adjudicated a second-felony offender, as defined in Penal Law § 70.06(a). At the time of petitioner's conviction in November 2008, Penal Law § 70.06 required that a second-felony offender receive an indeterminate sentence having a maximum term of 6 to 15 years and a minimum term of one-half of the maximum for a class C felony, *see* Penal Law § 70.06(3)(a) and (4)(a) (McKinney 2008), and a determinate sentence of at least 5 years, but not more than 15 years, for a class C violent felony, *see* Penal Law § 70.06(6)(b) (McKinney 2008). In addition, Penal Law § 70.45(2) required that a 5-year period of post-release supervision be imposed along with the determinate sentence. *See* Penal Law § 70.45(2) (McKinney 2008).

In accordance with these statutes, Justice Firetog sentenced petitioner to an indeterminate term of 5 to 10 years upon his conviction for manslaughter in the second degree—a class C felony, *see* Penal Law § 125.15. He also sentenced petitioner to a determinate term of 10 years and a 5-year term of post-release supervision upon his conviction for criminal possession of a weapon in the second degree—a class C violent felony. *See* Penal Law § 70.02(b) (McKinney 2008). Since these sentences were within the statutory range, petitioner's excessive sentence claim does not raise a federal constitutional issue and is not cognizable upon habeas corpus review. *See White*, 969 F.2d at 1383.

## *CONCLUSION*

For the reasons set forth above, the instant petition for a writ of habeas corpus is DENIED. A certificate of appealability shall not issue because petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112-13 (2d Cir. 2000). The Clerk of Court is directed to enter judgment denying the petition and close this case.

**SO ORDERED.**

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: March 26, 2015
       Brooklyn, New York